Wright, J.,
delivered the opinion of the Court.
This is an action on the case, brought by McWhirter, against Douglas, in the Court below, on an instrument in these words:
*593 “Nashville, Nov. 27, 1852, Mr. And. J. McWhirter, I will pay you the estimated discrepancy between what the business of H. & B. Douglas & Co. promises for the nest three years, as compared with an offer made to you, by another party for, same time, which we now presume to be, from one dollar to three thousand dollars, so soon as a correct amount can be arrived at.
“Hu. Douglas.”
In order to comprehend this writing, we must look to the facts, and circumstances under which it was executed, and to which it refers. On the 1st of December, 1849, Hugh and Byrd Douglas, merchants of Nashville, having an actual capital of $174,843.33, took into partnership with them, till November 30th, 1852, said McWhirter, Samuel C. Godshall, and Jagper N. Bailey, neither of whom had any capital. By the articles of partnership, dated December 1st, 7849, Hugh Douglas was to be head salesman, regular cashier, and controlling proprietor; Byrd Douglas, head purchaser, correspondent and controlling proprietor; Godshall, book-keeper, assistant correspondent and cashier; McWhirter, salesman, and general business man, and Bailey, the same. Balances were to be made to the last of May and November, yearly, to ascertain the gross debt due, from which was to be deducted the uncollectible debt, not less than two and a half nor more than five per cent, to defray the expense of closing the business to the date of the balance, the annual salaries of the partners, to wit: To Hugh Douglas, $1,000; Byrd Douglas, $1,000; Godshall, $1,000: McWhirter, $750, and Bailey, $750, to be placed to the credit of each, by charging the same to “expense account,” and six per cent, per annum interest on the active capital of Hugh *594 and Byrd Douglas, as above stated: thus ascertaining the profit, or dividend, which was to be apportioned as follows: eighty-five per cent, thereof, equally, to Hugh and Byrd Douglas, and the residue, or fifteen per cent., in equal sums to Godshall, McWhirter and Bailey, to remain in, and be used by the house, for six months, without interest, and then to be subject to draft by the parties respectively, as cash. The articles contain certain other stipulations as to the power of Hugh and Byrd Douglas, to discontinue the business if, in their opinion, it should be found less profitable than would justify the longer existence of the partnership; and also providing for the possibility of the death of Hugh or Byrd Douglas, or of the death, sore affliction, or disqualification of either of the junior members; but they need not be further noticed.
On the 29th of November, 1852, the new firm of H. & B. Douglas & Go., was formed, by articles executed at that date, to continue three years from the 1st of December, 1852. The capital to be furnished by Hugh and Byrd Douglas, was to be $200,000, and that by the junior members each, $2,500, to be employed in the same business, by the same parties, and in the same capacities, as before. Balances were to be made to the last of May and'November, to ascertain the gross debt due, from which was to be deducted the uncollectible debt, not less than two and a half, nor more than five per cent., to be used to pay extraordinary losses, in conducting the business to which it belonged, an annual salary of $2,000 to each of the partners, and six per cent, per annum, interest on the active capital furnished by each partner; thus ascertaining the profit, or dividend, which was to be appropriated as follows: Seventy per cent, thereof, equally, to Hugh and Byrd Douglas, and the *595 residue of thirty per cent., in equal amounts, to G-odshall, McWhirter and Bailey, due at six months from the date of the balance. The old articles were incorporated into the new, and wherein they were left unchanged by the latter, become the rule for the guidance of the new firm.
There existed in Memphis, a copartnership of merchants of long standing, who did business under the firm name of Cossett, Howard & Hill, composed of E. PI .Cos-sett, James M. Howard and Ira M. Hill, which would expire, by limitation, on the 1st of July, 1853. When the old partnership of H. & B. Douglas & Co., was about expiring, McWhirter opened a negotiation with the house at Memphis, for a partnership with them. This negotiation was carried on by letters and telegrams, between Cossett and McWhirter, of which we have only those written by the former to the latter.
The result of the negotiation was, that Cossett and Hill offered to lake McWhirter into their firm, commencing in January, 1853; first, as a clerk, with a salary at the rate of $2,000 per annum, until the first of July thereafter; and if, after the six months active business acquaintance with each other, growing out of that relation, all parties were mutually agreed, (of which it was supposed there could not be the slightest doubt,) then, as a partner with them, with an interest of twenty per cent, in their business; they to furnish the capital, about $100,-000, at six per cent, interest, and the partnership to commence July 1, 1853, and to continue from three to five years — say for three years, or even two years — if desired by McWhirter; but subject to be dissolved by either partner upon thirty days written notice: the stock — which was thirty to forty thousand dollars — to be taken at New York cost, and depreciated goods at value; in case of *596 dissolution, Gossett and Hill to have the right to settle tbe business, and purchase the stock of goods at New York cost, or value — the capital to be paid back before a division of the profits; in the event of the death of either partner, tbe dissolution to date from the last half yearly statement previous to the decease; and neither partner to draw annually over $2,000 per annum, on shares of twenty per cent, of profits. Gossett’s business was to purchase the stock, McWhirter’s to make sales, acquaintances in the country, and collections; and Hill’s to superintend the finances, books, correspondence and sales. In the letter of the 15th of November, 1852, (among.other things) Gossett said; “I think you underestimate our business now; our books show a net profit of about $75,000, for the two years past, in round figures; I put our last three years business at $40,000 per annum; perhaps it would fall $2,000 per annum, short of that amount. That business can be continued almost without an effort. Our object will be to increase the cash and short time trade, and cut off some responsible, but slow customers. We should make very little effort to increase our business this Spring, Our object would be to collect closely and prepare well for the Fall trade. I wish you to bear in mind, twenty per cent, will amount to $7,000 or $8,000, as our business now stands, and we should hope to increase it.” And in tbe letter of the 17th of November, he says: “Our business for two and a half years past, we estimate at $90,000, net. We offered to buy Mr. H’s interest at that rate.”
On the 25th of November, McWhirter, by dispatch to New York, accepted the offer of Oossett and Hill, and on the same day, Hugh and Byrd Douglas telegraphed *597 Cossett, in these word: “We cannot let McWhirter go.” In order to persuade McWhirter to become a member of the new firm of H. & B. Douglas & Co , Hugh Douglas addressed to him the writing sued on, which Mc-Whirter accepted and declined the offer of Cossett and Hill, who promptly released him from his agreement with them; and thereupon the new partnership of H. & B. Douglas & Co., was formed as herein before stated. Douglas not only knew of the offer of Cossett and Hill, but it is fair to suppose, from the tenor of the writing, that the terms of the offer had been stated to him, though he may not have been shown the correspondence between Cossett and McWhirter.
McWhirter remained in the firm of H. & B. Douglas & Co., for the three years ensuing the 1st of December, 1852, and received — as is proved by G-odshall — in salary and profits — not including interest — on and before the 5th of January, 1856, $15,776.04, from this firm, for the whole time it was in business. And we are not able — from our construction of the articles of partnership, and the proof — to say that he received a greater amount.
McWhirter, assuming that he had not realized from the business of his firm, as much as he would have made, had he accepted the proposal made to him by Cossett and Hill, brought the suit against Hugh Douglas, upon the paper of the 27th of November, 1852.
Cossett proves that the offer to McWhirter was made in good faith, that the statements in the letters were substantially correct, and that, if all parties were satisfied, the offer would have been carried out. He declines saying anything as to the value of McWhirter's situation under the offer.
*598 On the trial, McWhirter introduced Mr. Hill, the member of the Memphis House, and put the question to him : What the profits of that house had been during the three years ensuing the 1st of December, 1852 ?
The witness declined to state, unless directed to do so by the Court, and caused the question of his obligation to answer the interrogatory to be argued by counsel of his own. The Court refused to compel the witness to answer and state the profits as requested, but overruled Douglas’ objection to the testimony.
Thereupon, he was asked this question: How much ought your house to have made ? This was objected to by Douglas; but the Court permitted the witness to answer, and he said: His house, or rather, a house with the capital of his, ought to have made $35,000 or $40,000 a year, and that his house met with no reverses in the years 1852-3-4 and 5. And this answer was allowed to go to the jury, as evidence of the measure of the plaintiff’s damages — the defendant excepting to the evidence. It was proved by Godshall, that the business of the house of H. & E. Douglas & Co., for the three years in question, promised to realize $20,000 a year for the junior partners ; that is, the witness expected them to make that amount, but did not know the expectation of others, nor was there any computation among them in reference to it, so far as he knew. There is no proof beyond what has already been stated, as to the value of the offer made by the Memphis House, or how far it exceeded what the business of H. & B. Douglas & Co. promised.
The Court in substance, charged the jury — that, if they found the contract was made and'carried into effect, the plaintiff was entitled to recover from the defendant, *599 the difference between what he received from the firm of H. & B. Douglas & Co., and what he would have received from the firm of Cossett, Hill & Co., and they would ascertain that from the proof — looking to the actual net profits of each house. The Court, among other things, said : The legal effect of the contract being that the defendant was to make the situation of the plaintiff, in the Douglas house, as profitable as it would have been in the house of Cossett, Hill & Co.
The jury, on the 18th of May, 1859, rendered a verdict in favor of McWhirter, for $4,262.84. Douglas moved for a new trial, which was overruled, and took his bill of exceptions, and prosecutes an appeal in the nature of a writ of error, to this Court.
We do not agree with the Circuit Judge in his construction of this contract. In his view, if the Douglas House, as it is called, had, by some bad fortune, or ill luck, made nothing, Douglas was bound to pay McWhir-ter the entire amount of twenty per cent, of the profits of the Memphis House. And on the other hand, if the share of McWhirter, in the profits of the Douglas House, proved to be equal to, or to exceed what he would have received in the Memphis House, Douglas’ contract was saved, and he owed him nothing. In other words, the actual result, or profit, in the business of the two houses, constituted the data, or basis upon which the parties were to settle. This insured McWhirter the chances of the labor and skill of both firms. If his own failed, and the other succeeded, he was safe. If they both succeeded — but the other house beyond his — he was, at all events, to have his part of the excess. Certainly they might have made such a contract. But *600 have they done so? Douglas, might have said to McWhirter: When the business of the two firms is over, and the actual profits of each known, if what you get from my House is not equal to twenty per cent, of the profits of the other House, I will make it so. But, the language of this writing is very different, and, in our opinion, conveys no such idea. What, then, was meant? Douglas said to McWhirter: You have before you two offers, one in my House, and one in the Memphis House; the business of my House bids fair, (judging from the past and the additional capital to go in,) to make so much; and that of the Memphis House, (judging by what Gossett says,) to make so much: You think the offer of the Memphis House is the better one of the two; so do 1: We have compared the two offers, and computed their value, and we now suppose the offer of the Memphis House to be the more valuable, by from one dollar to three thousand dollars : if you will give up the Memphis offer and become a partner in my House, I will pay you the difference in the value of the two offers, so soon as the actual sum can be arrived at: we have now, in our minds, some data, or rule, by which this is to be reached, and to which, as soon as we can, we will resort to settle it.
This, we take to be the legal effect of the writing. They did not intend to wait, or look to the actual result of the business of these two firms; nor are we permitted to do so. They had already, at the time of the writing, estimated, within certain limits, the difference, or, (as the writing has it,) discrepancy between the value of the two propositions; and the certainty of the same was to be worked out as soon as it could be correctly done. It *601 was to this estimate, the parties referred as the basis of the contract, and by it they must be held. We are to place ourselves in their shoes at the time of the contract, and with the lights then before them, as to the relative value of the two offers, irrespective of what was, eventually, the result of the business of the two firms; determine, if it be practicable, what is due from Douglas to MeWhirter, upon the contract. The difficulty in this construction, and which, we think, must, of necessity, be the true one, is to state grounds upon which damages can be assessed upon any sound principle of law; for, if the terms of the contract be such as to make it impracticable, consistent with legal rules, to arrive at any measure of damages, this, alone, is fatal to the action; or at least to the recovery of more than nominal damages.
Now, according to the view we have already taken of the case, it is apparent upon the face of the contract, that the parties themselves considered that some amount — ranging from one dollar to three thousand dollars — was due from Douglas to MeWhirter. So that, without more, the plaintiff could never be dismissed out of Court; and we apprehend, unless it were shown by proof aliunde the contract, — that his' rights were merely nominal, — he must recover substantial damages — namely, some amount intermediate the one dollar and three thousand dollars — designated by the parties. Perhaps, in such a case — there being no legitimate proof at all, but the writing — it would be fit and just to assume $1,500, with proper interest, as the true sum; and this upon the principle, that the parties themselves had the right to set a value upon the contract in dispute; and having done 'so, their own rule of damages will not be disregarded by the Court: Me- *602 Neil vs. Reed, 9 Bing., 68. But, as a mode of arriving at the exact damages, or sum due, the contract contemplates that other data or pi’oof, beside that furnished by the instrument' itself, was to be resorted to ; but what that was to be, is not shown in the writing, or elsewhere in the record. This being so, if we attempt to enlarge the. damages beyond the sum already stated, as reasonably to be inferred from the terms of the writing itself, we are at once in the field of speculation and conjecture. In simple breaches of contract, what are termed speculative profits or damages, are not allowed; for, in such case, the nature of the thing admitting the establishment of certainty and precision, the plaintiff is not entitled to damages for any fancied, or probable advantage he might have derived from his contract. Thus, where the defendant contracted to repair a boat, so as to fit it for going down the river on a trading voyage, the plaintiff is not entitled to damages for what he might have made by the trading, on a breach of this contract. What it would take to repair the boat, is the measure of damages: Henrick vs. Stewart, 1 Ten., 476-478, cited in 1 Meigs’ Dig., 411. To the same effect is Pettee vs. Tennessee Manufacturing Company, 1 Sneed, 381-389, where the principle is fully examined. The doctrine rests on two reasons: First, that otherwise the damages, owing to their remoteness, would have no reference to the particular thing, which is the object of the contract; and, secondly, because of their uncertainty, they would be incapable of ascertainment by any satisfactory and known rule. In the case in Sneed, the Court say: If speculative profits or losses of interest upon capital, are to be taken into view in the assessment of damages, they should be ex *603 pressly stipulated for in the contract itself. The rule would, otherwise, be too vague and indefinite, and would have no reference to the particular thing which is the object of the contract; and unlimited discretion would be left to the jury. The same general doctrine is to be found in Masterton vs. The Mayor, &c., of Brooklyn, 7 Hill, 61. And if the assessment of remote or speculative damages is claimed to be taken out of the general rule, by reason of an express stipulation to that effect, we understand, from the authorities, that all uncertainty, both as to the object of the contract and the amount of damages, must be removed by the contract itself. Otherwise, the stipulation, however vague, will serve but to destroy the rule. They cannot be considered, unless capable of 'computation, with reasonable certainty and precision. Remote and contingent damages, depending on the result of successive schemes or investments, are never allowed for the violation of any contract. Such a rule would be, in the highest degree, unfavorable to the interests of the community. The subject would be involved in utter uncertainty. It would be a calculation upon conjectures, and not upon facts: 1 Sneed, 381-388-9; 7 Hill, 62-74; Bell et als. vs. Cunningham, 3 Pet., 69-85; Adderly vs. Dixon, 1 Lim. & Stewart, 607. It is upon this ground a Court of Equity decrees the specific performance of an agreement for a partnership, — the profits being uncertain and incapable of being put at any fixed amount, — so that, at law, the damages might be nominal: 1 Lim. and Stewart, 607; Collyar on Partnership, 107-8. But this is never done where the partnership might be dissolved, by the parties, immediately afterwards: Henry vs. Birch, 9 Ves., 358. *604 The interest is too uncertain and intangible to have the favor of a Court of Equity. If the difficulty arising from the uncertain nature of the subject itself, is to be avoided, the parties themselves, must, in their contract, calculate and adjust the damages, or refer to some satisfactory method by which they may be ascertained. In McNill vs. Reed, 9 Bing., 68, where an action was brought for the breach of an agreement to form a partnership, and it was proved that the plaintiff had given up the command of an East India voyage, as was well known to the defendant, he was allowed to show the value of the voyage, not as special damage, but as an ingredient of estimating the value which each of the parties set on the contract in dispute. Now, in that case, the object of the suit was not the loss of the command of the East India voyage, or damages for being induced to give that up; but the suit was to obtain damages for not .being admitted a partner in the defendant’s house, and the difficulty was, the amount. No attempt was made to measure the damages by the opinion or judgment of witnesses as to the value of the offer, or contract, or the amount of the probable profits of the partnership. But because the parties themselves had set a value on the contract in dispute, and had considered the engagement as equivalent to the command of an East India voyage, shown to be of the probable value to the Captain of not less than five hundred pounds, that was taken as evidence of the value of the plaintiff’s interest in the profits of the partnership; so that all that had to be done there was to reach the value of the command of a sinyle voyage, not of successive schemes, or investment. And even as to this case, Mr. Sedgwick, in his work, on the Measure *605 of Damages, 98, says: There is great difficulty, however, in principle, in admitting evidence of this kind, in cases of contract. It is a practical abandonment of those safe rules which go to exclude remote damages.
Another reason why speculative estimates of profits will not be allowed, is, that it is not proper to admit witnesses to testify their opinion, as to the amount of damage which the plaintiff has sustained in their loss, or deprivation. They can only testify as to facts: Sedg-wick, 589, 591. And to permit a witness to testify as to what a mercantile house ought to have made upon a given capital — in order to reach anticipated profits — is even more objectionable. Here McWhirter, in the offer of Cossett and Hill, was to share only in the 'profits. He was to take none of the capital. It was uncertain whether they would all agree — upon the six months probation — to form the partnership; and then it was dissolvable by death, or by the action of either of the parties in thirty day’s time; and the good fortune of the house, in its successive schemes of investment, sale and re-investment — was all to risk. How then could the value of the offer to McWhirter — unless fixed by him and Douglas — be anything but conjectural? It may turn out, therefore, from the very nature of the contract itself, that as to a part of the plaintiff’s claim for damages precise accuracy cannot be attained, because of the impracticability of its establishment by legal proof.
We cannot see that this contract is illegal, as being in restraint of trade, immoral, or against public policy; or that, in its enforcement, it is at all necessary to exercise any power violative of the private rights of the Memphis House, which may lead to social disturbances *606 and breaches of the peace; certainly not in our construction of it. It does not necessarily afflict either the feelings or interests of the members of that firm, or expose them to libel or ridicule, even if such an objection, wherever a question arises upon a real matter of right, were valid. We cannot suppose that their dealings, if they become material, have been illegal or improper. This is not, in principle, like the case of DaCosta vs. Jones: 2 Cowper, 729, to which counsel refer us. It is 'not a contract voluntarily and impertinently gotten up, out of the course of business and trade, wantonly to expose the private affairs of the Memphis House. A contract must plainly appear to be illegal before we can so- pronounce. Mr. Cbitty, in his work on Contracts, 217 says: A doubtful matter of public policy is not sufficient to invalidate a contract. An agreement is not void on this ground, unless it expressly and unquestionably contravene public policy, and be injurious, beyond all doubt, to the interests of the State.
How far the members of the firm at Memphis may be protected from answering particular interrogatories relevant and material to the issue in this cause, that may be propounded to them, wo need not now decide, as we cannot see that it is requisite that we should do so, and no special question of the kind has been raised, or argued before us. It is enough to dispose of such questions as they arise.
The result is, the judgment of the Circuit Court must be reversed, and a new trial awarded.